2004-NMCA-122

99 P.3d 690

**In the Matter of the Protest of Val Kilmer and Joanne Whalley,**

**Val KILMER and Joanne Whalley, Defendants–Appellants,**

v.

**Jan GOODWIN, Secretary, New Mexico Taxation and Revenue Department, Plaintiff–Appellee.**

No. 23,738.

Court of Appeals of New Mexico.

Aug. 31, 2004.

Paul A. Bleicher, Albuquerque, NM, for Appellants.

Patricia A. Madrid, Attorney General, Bruce J. Fort, Special Assistant Attorney General, New Mexico Taxation & Revenue Department, Santa Fe, NM, for Appellee.

## OPINION

WECHSLER, Chief Judge.

{1} The issue in this case is whether the New Mexico Taxation and Revenue Depart-

ment ("Department") and its hearing officer properly determined that Val Kilmer and Joanne Whalley's ("Taxpayers") claim for a tax refund was time barred. We consider the relevant statutes, Taxpayers' claim that estoppel should be applied against the Department, and Taxpayers' claims that certain findings of the hearing officer are not supported by substantial evidence. Because it was incumbent upon Taxpayers to either file a protest or an action in district court within the 210–day period contained in NMSA 1978, § 7–1–26 (1997), and because the requirements for estoppel are not met, we affirm.

*Background*

{2} Taxpayers filed a New Mexico personal income tax return for 1995. However, at some point in the latter part of 1995, Ms. Whalley had moved to California in contemplation of a divorce. The exact date of her move was disputed. In 1998, the California Franchise Tax Board ("Board" or "California authorities") began auditing Taxpayers' 1995 tax return because it believed that Ms. Whalley had moved to California about August 1, 1995. Taxpayers contested that conclusion and attempted to convince the Board otherwise.

{3} In 1999, while the California audit was pending, Taxpayers began investigating filing a protective claim for refund in New Mexico, because their 1995 New Mexico return was premised on Ms. Whalley's status as a New Mexico resident for the entire year. A protective claim is a claim designed to protect a taxpayer's position in one jurisdiction in case another jurisdiction rules against the taxpayer. Taxpayers continued their attempt to convince the Board that Ms. Whalley did not become a California resident as early as the Board had claimed, but began taking steps to protect their position in New Mexico in the event that the Board ruled against them.

{4} Taxpayers' representative in dealing with New Mexico was Ms. Enza Cohn, a California certified public accountant employed by Gelfand, Rennert & Feldman, LLC, a business management firm. The firm is a subsidiary of the national accounting firm PricewaterhouseCoopers. Ms. Cohn knew that California had a special form for protective claims. She was advised by tax experts at PricewaterhouseCoopers that New Mexico did not have a comparable form for protective claims.

{5} In late November 1999, Ms. Cohn called the Department for information regarding filing the refund claim. She spoke with Mr. Jerry Wells, the head of the Department's Income Tax Section, seeking advice about how she should file the claim for a tax refund. The evidence concerning the conversation is conflicting, and we discuss it in detail later in this opinion. Essentially, Ms. Cohn testified that she told Mr. Wells it was a protective claim. Mr. Wells did not remember being told it was a protective claim, but did remember that they discussed problems with the allocation between California and New Mexico based on a residency issue.

{6} Around December 20, 1999, Ms. Cohn called Mr. Wells because the December 31 statute of limitations deadline was nearing and she was concerned that the amended return she would be filing on Taxpayers' behalf might get lost due to mailing problems that commonly occur during the holiday period. Ms. Cohn stated that Mr. Wells told her to send the return directly to him, at a different address from the standard Department address.

{7} On December 21, 1999, Ms. Cohn mailed an amended 1995 New Mexico return claiming a refund on behalf of Taxpayers in the amount of $304,217.00. The return was timely mailed and was received by the Department on December 29. A cover letter contained a notation that it was regarding an "Amended Tax Return" and stated in relevant part:

> On behalf of the above taxpayers, we are filing the attached amended returns. The statute of limitations are [sic] due to expire *December 31, 1999.*

> The return is being amended for Joanne Whalley was found to be a nonresident of New Mexico as of August 1, 1995. She was a resident in the state of California for that period and forward.

> Attached to the tax return is a schedule that shows how the income was allocated

between the two spouses for the period Joanne became a nonresident.

{8} In January 2000, Mr. Wells contacted Ms. Cohn and asked for a copy of Taxpayers' 1995 California return. Ms. Cohn stated that she found the request somewhat "puzzling," but she complied. Ms. Cohn testified that she once again mentioned that the claim was protective, however Mr. Wells testified that he did not recall a protective claim ever being mentioned. Ms. Cohn stated that she called Mr. Wells "once or twice" more in the next six months and left messages, but her calls were not returned.

{9} The amended return was not processed because the Department lost it. Department policy may have been partly to blame. Prior year income tax returns are not entered into the Department's computer system, but are handled manually. Additionally, in early 2000, the Department made a decision that it would not work prior year income tax returns three or more years old until it could get caught up processing the current year returns. This policy was in effect for three months in early 2000, and during this period, the Department did not take action on 800 returns. Of the 800, twenty percent became stale because there was no action taken by the taxpayers within the relevant statutory period to confront the Department inaction and keep the refund claim alive.

{10} On July 27, 2000, Ms. Cohn called the Department. The employee who answered the call said that there was no record of the amended return being filed and that she would look into the status of the refund. She suggested that Ms. Cohn resubmit the amended return.

{11} On July 31, 2000, the Department sent a letter which stated in pertinent part:

> Your application for tax refund date December 21, 1999 in the amount of $304,217.00, for tax year 1995 has been denied pursuant to Section 7–1–26 NMSA 1978. This section provides that you may direct a written request for a hearing of your claim to the Secretary of Taxation and Revenue within thirty (30) days after the mailing of the denial. Enclosed is a copy of "Taxpayer's Remedies" for your information.

> This denial is made because your claim is stale and can no longer be acted on by the department.

{12} Taxpayers filed a protest on August 23, 2000. The protest was presented to a hearing officer, who considered evidence and issued a decision containing findings of fact and conclusions of law. The hearing officer determined that the Department had no authority to act on the claim because it was time barred. The hearing officer also rejected Taxpayers' argument that estoppel should be applied against the Department.

## Standard of Review

{13} Under NMSA 1978, § 7–1–25(C) (1989), we review the hearing officer's decision to determine whether it is arbitrary, capricious, or an abuse of discretion; not supported by substantial evidence in the record; or otherwise not in accordance with law. To the extent this appeal requires us to interpret statutes, our review is de novo. See *Morgan Keegan Mortgage Co. v. Candelaria*, 1998–NMCA–008, ¶ 5, 124 N.M. 405, 951 P.2d 1066. We review factual findings to determine whether, considering the whole record, they are supported by substantial evidence, which is defined as evidence that a reasonable mind would find adequate to support a conclusion. See *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990) (defining substantial evidence); *Alexander v. Anderson*, 1999–NMCA–021, ¶ 23, 126 N.M. 632, 973 P.2d 884 (stating that the whole record is considered); *El Centro Villa Nursing Ctr. v. Taxation & Revenue Dep't*, 108 N.M. 795, 796, 779 P.2d 982, 983 (Ct.App. 1989).

## Time Limitations

### Section 7–1–26

{14} In *Unisys Corp. v. New Mexico Taxation & Revenue Department*, 117 N.M. 609, 610–13, 874 P.2d 1273, 1274–77 (Ct.App. 1994), this Court addressed an older version of Section 7–1–26 and held that a refund claim was time barred when the taxpayer did not confront the department inaction by timely filing either a protest or a civil action.

Since *Unisys Corp.*, the legislature has amended Section 7–1–26 several times. *See* History Notes to NMSA 1978, § 7–1–26 (2001). Taxpayers appear to concede that the version in effect in December 1999, when they filed their claim for refund, applies to this case. Section 7–1–26 states in relevant part:

> B. The secretary or the secretary's delegate may allow the claim in whole or in part or may deny the claim. If the claim is denied in whole or in part in writing, the claim may not be refiled. If the claim is not granted in full, the person, within ninety days after either the mailing or delivery of the denial of all or any part of the claim, may elect to pursue one, but not more than one, of the remedies in Paragraphs (1) and (2) of this subsection [a written protest, or a civil action in Santa Fe County district court]. *If the department has neither granted nor denied any portion of a claim for refund within one hundred twenty days of the date the claim was mailed or delivered to the department, the department may not approve or deny the claim but the person may refile it within the time limits set forth in Subsection C of this section or may within ninety days elect to pursue one, but only one, of the remedies in Paragraphs (1) and (2) of this subsection.* (Emphasis added.)

*Id.*

{15} The Department successfully argued to the hearing officer that when the initial 120–day period expired without the Department taking any action either approving or denying the claim, the onus was on Taxpayers who then had ninety days to either file a protest or an action in district court. Taxpayers did neither, and it was too late to refile. The hearing officer further agreed with the Department that when the 210–day period expired, without Taxpayers filing a protest or a civil action, the statute absolutely barred the Department from approving or denying the claim.

{16} The purpose of the time deadline in Section 7–1–26 is to avoid stale claims, which protects the Department's ability to stabilize and predict, with some degree of certainty, the funds it collects and manages. The time deadline places the burden of maintaining an active claim on the taxpayer and makes it the taxpayer's responsibility to confront the Department inaction. The legislature has apparently allocated that responsibility to the taxpayer because it is the taxpayer who can more easily keep track of the status of a refund claim. *See Madrid v. St. Joseph Hosp.*, 1996–NMSC–064, ¶ 10, 122 N.M. 524, 928 P.2d 250 (stating that unless a statute violates the constitution, "[w]e will not question the wisdom, policy, or justness of legislation enacted by our Legislature").

{17} Taxpayers contend that the 210–day window can be something more than 210 days. They rely on the language of Section 7–1–26(B) that if "the claim is denied ... in writing ... the person, within ninety days" may file a protest or civil action. Taxpayers argue that the Department's letter of July 31, 2000 constituted a written denial, and consequently their protest filed on August 23 was timely. Under their construction of the statute, no matter when the Department denied a claim for refund, the taxpayer would have ninety days to file a protest or civil action.

{18} In construing a statute, our concern is to determine legislative intent. *See Unisys Corp.*, 117 N.M. at 611, 874 P.2d at 1275. We look primarily to the language of the statute, and when the language is free from ambiguity, we will not resort to any other means of interpretation. *Id.* We construe all parts of a statute to achieve a harmonious whole. *See Cummings v. X–Ray Assocs. of N.M., P.C.*, 1996–NMSC–035, ¶ 45, 121 N.M. 821, 918 P.2d 1321. When a tax statute is ambiguous, it must be construed strictly against the state and in favor of the taxpayer. *See Molycorp, Inc. v. State Corp. Comm'n*, 95 N.M. 613, 614, 624 P.2d 1010, 1011 (1981).

{19} The first portion of Section 7–1–26(B) generally provides the required avenues for the taxpayer when the claim is denied in whole or in part. However, the legislature followed with specific language stating that after inaction for 120 days, the taxpayer then has ninety days to file a protest or a civil action. Section 7–1–26(B). We agree with

the Department that the legislature intended a clear and definite outer limit, of 210 days, on the Department's authority to act on a claim for refund. We note that subsequent changes to the statute make the legislature's desire for a definite limit on the Department's ability to act after 210 days even more evident. The newest version of the statute, NMSA 1978, § 7–1–26(B)(2) (2003), provides that: "After the expiration of the two hundred ten days from the date the claim was mailed or delivered to the department, the department may not approve or disapprove the claim unless the person has pursued [a protest or a civil action]." *Cf. N.M. Life Ins. Guar. Ass'n. v. Quinn & Co.*, 111 N.M. 750, 758 n. 7, 809 P.2d 1278, 1286 n. 7 (1991) (stating that "[w]hile it is difficult to ascribe legislative intent retroactively based on subsequent changes in model legislation, we interpret this change as clarification that the drafters of the Model Act intended more than simply the rights created under the policy to inure to the benefit of the Association").

{20} If we were to accept Taxpayers' argument, we would be undermining the legislature's definite time limit. A construction of Section 7–1–26 that allows a taxpayer ninety days to protest or file a civil action when the Department issues a written denial after the 210–day period has run would read the 210–day period out of the statute and potentially extend the time limit well beyond 210 days. We will not do so without a clear indication from the legislature.

{21} Moreover, under Taxpayers' construction, when the Department is faced with a situation in which a claim is stale, the Department could only rely on the 210–day limitation if it were uncommunicative and provided no information to the taxpayer. We decline to encourage a state agency to behave in this fashion. It makes far more sense for the Department to be able to respond, as it did, informing Taxpayers that it could not act on the claim.

{22} Taxpayers also appear to suggest that their August 23 protest would have been timely under NMSA 1978, § 7–1–24 (2000). That section allows a taxpayer to file a protest from "the denial of or failure to either allow or deny a claim for refund made in accordance with Section 7–1–26 NMSA 1978 by filing with the secretary a written protest." Section 7–1–24(A). Section 7–1–24(B) allows the taxpayer thirty days to file a protest from "the date of the mailing to the taxpayer by the department of the notice of assessment or mailing to, or service upon, the taxpayer of other peremptory notice or demand, or the date of mailing or filing a return."

■ {23} We disagree that Section 7–1–24(A) and 7–1–24(B) support Taxpayers' position. Section 7–1–24(B) does not mention claims for refund. Additionally, we decline to conclude that Section 7–1–24, which generally governs administrative hearing procedures, would apply rather than the specific language of Section 7–1–26. Again, if we were to adopt Taxpayers' argument, we would eviscerate Section 7–1–26's definite 210–day time limit on the Department's authority to act. Taxpayers can file a protest to the Department's decision that the claim is stale. They cannot, however, file the protest that must be filed between day 120 and day 210 to keep their refund claim alive.

*Implied Authority*

■ {24} Taxpayers argue that the Department has implied authority to allow claims after 210 days. *See N.M. Dep't of Health v. Ulibarri*, 115 N.M. 413, 416, 852 P.2d 686, 689 (Ct.App.1993) (stating that the authority of an administrative agency is not limited to those powers expressly granted by statute, but includes all powers that may be fairly implied). However, an administrative agency may not exercise authority beyond the powers that have been granted to it. *See N.M. Bd. of Pharmacy v. N.M. Bd. of Osteopathic Med. Exam'rs*, 95 N.M. 780, 782, 626 P.2d 854, 856 (Ct.App.1981). Given the prohibition on acting on claims for refund beyond the 210–day period, the Department does not have implied authority to do so. *See id.* at 782, 626 P.2d at 856.

*Estoppel*

{25} Taxpayers argue that estoppel applies against the Department because there were

no written procedures for protective claims, and they had to rely on what they were told to do by the Department. They also rely on specific statements by a Department employee and on the July 31 letter stating that they could protest the denial of their claim. Within our analysis of this issue, we address Taxpayers' factual claim that the hearing officer erred in finding that the Department did not make any misrepresentations.

{26} Courts are reluctant to apply equitable estoppel against a governmental entity. *Gallegos v. Pueblo of Tesuque*, 2002–NMSC–012, ¶ 24, 132 N.M. 207, 46 P.3d 668; *Hanson v. Turney*, 2004–NMCA–069, ¶ 19, 136 N.M. 1, 94 P.3d 1 [No. 22,851 (N.M.Ct. App. Apr. 1, 2004)]. Estoppel will not be applied against a state governmental entity unless "there is a shocking degree of aggravated and overreaching conduct or where right and justice demand it." *Wisznia v. State, Human Servs. Dep't*, 1998–NMSC–011, ¶ 17, 125 N.M. 140, 958 P.2d 98. In cases "involving assessment and collection of taxes, the state will be held estopped only rarely." *Taxation & Revenue Dep't v. Bien Mur Indian Mkt. Ctr.*, 108 N.M. 228, 231, 770 P.2d 873, 876 (1989). Estoppel cannot lie against the state when the act sought would be contrary to the requirements expressed by statute. *Rainaldi v. Pub. Employees Ret. Bd.*, 115 N.M. 650, 658–59, 857 P.2d 761, 769–70 (1993).

{27} A party seeking to establish estoppel against the government must establish that

(1) the government knew the facts; (2) the government intended its conduct to be acted upon or so acted that plaintiffs had the right to believe it was so intended; (3) plaintiffs must have been ignorant of the true facts; and (4) plaintiffs reasonably relied on the government's conduct to their injury.

*Gallegos*, 2002–NMSC–012, ¶ 24 n. 5, 132 N.M. 207, 46 P.3d 668 (internal quotation marks and citation omitted); *see also Bien Mur Indian Mkt. Ctr.*, 108 N.M. at 231, 770 P.2d at 876 (stating that the party seeking to establish estoppel must show that reliance was reasonable). In addition to these four factors, the plaintiff must demonstrate "affir-mative misconduct on the part of the government." *Gallegos*, 2002–NMSC–012, ¶ 24 n. 5, 132 N.M. 207, 46 P.3d 668 (internal quotation marks and citation omitted).

{28} We examine the conduct of both parties to determine whether estoppel applies. *See Gonzales v. Pub. Employees Ret. Bd.*, 114 N.M. 420, 427, 839 P.2d 630, 637 (Ct.App.1992). We have been willing to grant estoppel when a party relied on written assertions made by the taxing authorities, but not when the party relied on oral representations. *See Bien Mur Indian Mkt. Ctr.*, 108 N.M. at 231, 770 P.2d at 876 (refusing to apply estoppel when only oral representations were made and relied upon); *United States v. Bureau of Revenue*, 87 N.M. 164, 166, 531 P.2d 212, 214 (Ct.App.1975) (holding that the government was estopped to collect taxes when, over a period of years, it made written assurances that such taxes would not be owed).

### Oral Statements by Mr. Wells

{29} We are sympathetic to Taxpayers' plight. Our statutes and rules do not address a protective claim. The testimony indicates that the Department treated that type of claim differently. The Department had an internal, unwritten policy to deny protective claims and then wait for a protest to be filed. The protest division would hold the protective claim until the foreign jurisdiction resolved the claim pending before it. In this way, the Department avoided the time problems created by the limitations in the statutes.

{30} This policy was not stated in anything available to someone attempting to research statutes or regulations. Ms. Cohn's research found nothing indicating how to file a protective claim in New Mexico. There is no question that she and Mr. Wells spoke on November 29, 1999, although the evidence was conflicting on the substance of their conversation. According to Ms. Cohn, she sought guidance from the Department about the action she should take to file a protective claim. She testified that she told Mr. Wells that she was filing a protective claim and that he told her how to proceed. She stated

she told him, a second time, on January 14, 2000, that it was a protective claim.

{31} In contrast, Mr. Wells testified that he did not recall ever being told the claim was protective, but remembered that they discussed problems with the allocation between California and New Mexico based on a change in residency. He stated that he did not remember telling Ms. Cohn how to file a protective claim. Mr. Wells did testify, however, about his normal practice when he was informed about a protective claim. The claim would be denied to enable the taxpayer to protest.

{32} Taxpayers argue that Mr. Wells must have remembered more than he was indicating because the claim for refund was large and involved two renowned actors. However, it is also true that, at the time he testified, Mr. Wells had been retired for over two years and was being asked about a particular conversation or conversations he had engaged in more than two-and-one-half years earlier.

{33} Faced with a conflict in the testimony about whether Mr. Wells knew or was told that the claim was protective, the hearing officer resolved the factual issue against Taxpayers. Taxpayers argue that the hearing officer's finding that Mr. Wells had no knowledge of the protective nature of the claim is not supported by substantial evidence. Taxpayers deem this finding critical, because it is the foundation of their estoppel argument that Mr. Wells knew that the claim was protective and informed them of what action to take. Of course, if the Department did not know the facts and did not tell Taxpayers how to proceed, then the requirements for estoppel are not met.

{34} The hearing officer was persuaded by Mr. Wells' testimony about his normal practice when informed that a claim was protective. The hearing officer assumed that Mr. Wells would have followed his normal practice if he had been told the claim was protective and would have quickly denied the claim. Additionally, Taxpayers' handling of the matter did nothing to clarify the situation. Even accepting Ms. Cohn's testimony that Mr. Wells knew from telephone conversations that the claim would be protective, the written documents she later submitted failed to notify the Department that the claim was protective. Ms. Cohn did not write the words "protective claim" on the amended return or in the accompanying cover letter. If anything, the cover letter suggested the opposite, stating that, "[t]he return is being amended for Joanne Whalley *was found to be* a nonresident of New Mexico as of August 1, 1995." (Emphasis added.) The cover letter appears to assert, incorrectly, that the California matter had been resolved, which would mean that the New Mexico claim was no longer a protective claim.

{35} The background for Ms. Cohn's statement that Ms. Whalley "was found to be" a resident of California on August 1, 1995 requires some discussion. The California authorities issued a tentative position letter to Taxpayers on July 26, 1999, stating their proposed conclusion that Ms. Whalley was a California resident on August 1, 1995. Ms. Cohn responded by letter, disagreeing with the proposed conclusion. On November 29, 1999, Ms. Cohn wrote an internal memorandum to her supervisor stating that "the first stage of the fight seems to be over. The auditor will not let up and insists on making Joanne Whalley Kilmer a California resident as of August 1995."

{36} On December 21, 1999, the California auditor wrote Ms. Cohn a letter stating that the auditor's position had not changed. Ms. Cohn testified that she had not received this letter on December 21, which is the same date on Ms. Cohn's cover letter to the Department that Ms. Whalley was "found to be" a California resident on August 1, 1995. However, Ms. Cohn had recently spoken with the auditor and knew the letter was coming. The difficulty is that California's decision on December 21 was not necessarily final, although Ms. Cohn may have considered the effort to have been lost. The Board did not actually issue the proposed adjustment to Taxpayers' 1995 California income taxes until September 2000, and Taxpayers filed a protest in California on September 25, 2000. Taxpayers and the Board eventually settled their case on August 9, 2001.

{37} Ultimately, we need not determine exactly when the California determination became final, or whether Ms. Cohn's statement that Ms. Whalley "was found to be" a California resident is true or false. The significance of the statement is that when such a statement is presented to the Department, the language would not signal a protective claim, but would suggest the opposite—that the matter had been resolved in California. Taxpayers' failure to clearly notify the Department in writing that the claim was protective, and the statement in the cover letter suggesting that the matter had been resolved in California, must weigh against Taxpayers. *See Gonzales,* 114 N.M. at 427, 839 P.2d at 637. Indeed, it is very possible that Ms. Cohn mentioned to Mr. Wells that the claim was protective, because her quandary about how to file a protective claim was such an obvious concern. Consequently, it seems very unlikely that she would not have mentioned it at all, particularly given that the Department's internal policy on protective claims is not readily available to the public. However, even if Ms. Cohn had told Mr. Wells in an earlier telephone conversation that the claim was protective, on receiving the later cover letter suggesting that the California matter had been resolved, Mr. Wells could reasonably have concluded that the letter superseded the earlier conversation. A taxpayer dealing with a large bureaucracy like the Department has some obligation to clearly inform it, preferably in writing, of the crucial or distinguishing facts.

{38} As a result, the hearing officer's finding that Mr. Wells did not know that the claim was protective is supported by substantial evidence based on an examination of the whole record. *See Landavazo,* 111 N.M. at 138, 802 P.2d at 1284 (defining substantial evidence as "evidence that a reasonable mind would find adequate to support a conclusion"). Nevertheless, even if we were to reverse the hearing officer's finding and conclude that Mr. Wells knew that the claim was protective, we do not consider that fact to be dispositive. The other requirements for estoppel are not met.

{39} Accepting Ms. Cohn's testimony as true, it appears Mr. Wells did nothing more than tell her to file an amended return and to wait and see what action was taken. Ms. Cohn's testimony follows:

Taxpayers' counsel: Did [Mr. Wells], did he, what did he say should be the next course of action?

Ms. Cohn: Basically it's a wait-and-see, that the refund claim was very large of an amount, because I remember asking how long is this going to take, that it would take some time, that he was busy, but and because it was a very large refund that it wouldn't happen relatively soon, don't worry about it, you know, we'll talk later on or something to that effect, in the near future.

Counsel: Did he indicate, what did he indicate would be the very next step, if any?

Ms. Cohn: I don't remember him indicating in particular what the next step would be other than we'll wait and see what the refund is.

Counsel: Did he ask you then to contact him?

Ms. Cohn: No, he did not. He didn't even mention to me, the, this, he didn't mention anything with regard to, you know, calling me back. He didn't mention to me that he was retiring, he didn't mention anything to me.

{40} These statements attributable to Mr. Wells do not give rise to estoppel. It is undisputed that the Department did not make any written representations during the 210–day period about how Taxpayers should proceed. Mr. Wells' statements merely informed Ms. Cohn to wait to see the manner in which the Department would decide the issue. Such a generic, oral representation does not provide a basis for estoppel. *See Bien Mur Indian Mkt. Ctr.,* 108 N.M. at 231, 770 P.2d at 876 (holding that the appellant "did not act reasonably in relying on the oral representations of the Department").

{41} Additionally, in considering the conduct of both parties to resolve the estoppel issue, *see Gonzales,* 114 N.M. at 427, 839 P.2d at 637, we weigh the fact that Ms. Cohn is a professional, capable of performing her own research and had done some research on New Mexico tax law. She had at her dispos-

al the resources of a national accounting firm and sought its advice. Consequently, she was able to find Section 7–1–26 and consider that Department inaction for 120 days might require her to respond to the Department's inaction, regardless of the information Mr. Wells may have provided her. With Ms. Cohn's level of expertise, the resources available to her, and the language in Section 7–1–26 addressing the action a taxpayer should take when Department inaction exceeds 120 days, Taxpayers cannot rely on estoppel against the Department. In the balancing of equities required under the doctrine of estoppel, it was not reasonable for Ms. Cohn to assume that she would not need to do anything further except wait for the claim to be denied. *See Patten v. Santa Fe Nat'l Life Ins. Co.,* 47 N.M. 202, 208, 138 P.2d 1019, 1023 (1943) (stating that when a party seeking to establish estoppel has the ability to obtain relevant information and shows indifference to the information at hand, the party may be precluded from relying on the doctrine of estoppel).

### The Oral Statement of July 27

{42} In support of their estoppel argument, Taxpayers further rely on what they term a "pattern of assurances" made by the Department. They refer to the Department's employee's comments made during a phone conversation on July 27, arguing that "telephonic assurances made to the Taxpayers' representative . . . that the matter would be resolved," constitute actionable misrepresentation. They also rely on Ms. Cohn's testimony that she was "further assured by other apologetic Department supervisors that the refund claim would be duly processed." She testified that, around July 27, she spoke to several other Department employees who told her something to the effect that she should not worry, that the Department would "take care of [her]," but that she "should go ahead and [file] a protest." We decline to hold that a public employee's courteous and apologetic oral statements that the agency will attempt to resolve a problem constitute a basis for estoppel. As we have discussed, oral statements do not normally provide a basis to apply estoppel against an agency. *See Bien Mur Indian Mkt. Ctr.,* 108 N.M. at

231, 770 P.2d at 876. Nor would reliance on such tenuous and generic statements be reasonable. *Id.*

### Estoppel Based on the July 31 Letter

{43} Taxpayers also suggest that estoppel should be applied against the Department because in the Department's July 31 letter the Department characterized its action as a denial and told Taxpayers they could file a protest within thirty days. We disagree that this action provides a basis for estoppel. The letter accurately stated the reason for the denial—that the claim was now stale— and correctly informed Taxpayers that they could protest that conclusion. Moreover, as we have discussed, Section 7–1–26 prohibited the Department from approving or denying the claim for refund. A letter stating that essential conclusion does not start the time running again, nor does it meet the requirements for estoppel. *See Rainaldi,* 115 N.M. at 658–59, 857 P.2d at 769–70 (stating that estoppel cannot lie against the state when the act sought would be contrary to the requirements expressed by statute).

{44} While we decline to find estoppel, we do not approve of the Department's conduct. The Department lost the amended return, a mistake that may have altered the course of this case. Additionally, the protective claim procedure was not readily available to the general public. Our public agencies should make every effort to provide complete and accurate information to those who seek their services. However, the burden of establishing estoppel against the government is high. *See Wisznia,* 1998–NMSC–011, ¶ 17, 125 N.M. 140, 958 P.2d 98. There was no misrepresentation, and Taxpayers have not met their high burden in this case.

### Conclusion

{45} The legislature has stated a definite requirement that it was incumbent upon Taxpayers to act within the 210–day window in Section 7–1–26. Taxpayers failed to do so. Under the facts of this case, their reliance on the oral statements of Department employ-

ees cannot excuse their failure to follow Section 7–1–26. We affirm.

{46} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and RODERICK T. KENNEDY, Judges.